IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 25-110-01 |
| PAUL DIMAIO | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Paul DiMaio abused his status as a lawyer to smuggle narcotics and other contraband into the Federal Detention Center. The Court should hold the defendant accountable for his actions by imposing a sentence of imprisonment at or near the top of the guidelines range.

**I.      BACKGROUND**

   **a.      Legal Background**

On March 20, 2025, a grand jury indicted the defendant for conspiring to smuggle contraband into the FDC in violation of 18 U.S.C. § 371 (Count One); for providing contraband to a prison inmate in violation of 18 U.S.C. § 1791(a)(1) (Count Two); and for making a false statement in violation of 18 U.S.C. § 1001(a)(2). On June 18, 2025, the grand jury returned a superseding indictment that added an additional defendant and continued to charge DiMaio with three felonies. On October 15, 2025, DiMiao pled guilty to all three counts.

   **b.      Factual Background**

On January 13, 2025, the defendant, a criminal defense attorney, and Jahlil Williams, a Federal Detention Center – Philadelphia ("FDC") inmate, had a legal visit at the FDC, even though the defendant was not representing Williams. On February 1, Jada Williams, Jahlil's sister, asked the defendant for his Cash App account and then sent the defendant $2,000 through Cash App. Two days later, at 7:30 a.m., the defendant and Jahlil Williams spoke on a three-way

call. The defendant told Jahlil, "I've got to come see you, I've got to see your buddy too." Later in the call, the defendant asked Jahlil if his "cousin" needed to talk about a legal case and if the "cousin" was trustworthy.

Later on February 3, 2025, at 6:13 p.m., Jahlil Williams made a three-way call with his sister Jada and his mother, Tanya Culver. Jahlil asked Culver to "take a picture of what you got" and "is it possible to get another one." Culver responded by asking if Jahlil wanted "two" or "three." Jahlil then asked, "What was the plan, was it 50 dollars or 60 dollars?" Culver responded, "25 dollars a month." Jahlil then asked, "Why would you get me that cheap ass plan, mom?"

Later that night, at 8:38 p.m., Jahlil Williams made another three-way call and asked, "Hey mom…can you charge it up?" An unidentified female can then be heard saying, "Make sure you charge that jawn up." When Culver asked if Jahlil needed a second item, Jahlil replied that he needed "just the cord." Culver then stated, "I just talked to Mr. Paul too, I called Mr. Paul." Video from the FDC shows that Nyeem Thrones, another FDC inmate, stood next to Jahlil Williams during portions of this call.

In addition to the foregoing calls, Jada Williams texted the defendant on February 3, "My mom is gonna take care of everything for me and drop it off to you by tonight if that's fine with you." The defendant responded, "I'm tied up tonight with the family. Can she meet tomorrow morning?"

On the morning of February 4, Jahlil made a three-way call with Jada and Culver. Jahlil asked his mother if she had talked to a male. Culver responded, "Who, Mr. Paul?" Jahlil

2

Williams responded, "Yeah." Culver then stated that she would call "Mr. Paul" and indicated that it cost her $300 to purchase a cell phone.

Later that morning, at 10:36 a.m., Jahlil called Jada and asked her to text Nyeem Thrones' name and BOP number to the defendant. Jada then conducted a three-way call with Culver. On the recorded line, Culver stated, "I'm in the car with Mr. Paul." Jahlil stated, "Tell him I said don't forget nothing," to which Culver responded, "I got you on speaker." Culver then stated, "Jahlil said don't forget nothing," and a male voice replied, "Yeah, yeah."

On February 4, 2025, at 10:53 a.m., surveillance video recorded the defendant entering the FDC with two "redweld" type folders. The defendant then completed and signed BOP Form A0224, stating that he had come to visit inmate Thrones. The form states, "You are prohibited from…possessing prohibited objects on Bureau grounds, or in Bureau facilities, without the knowledge and consent of the Warden," and that drugs, intoxicants, telephones, and electronic devices are all "prohibited objects." In addition, the form includes the following question: "Are any of the following items in your possession, or in possession of children in your party under 16 years of age?" (emphasis added). In response, "No" is checked next to all of the listed prohibited items, including but not limited to telephones, electronic devices, narcotics, prescription drugs, and tobacco products. Above a signature line, the form states:

> I have read, I understand, and I agree to the above. If I am visiting with an inmate, I also understand and agree to abide by the visiting guidelines provided me by this institution. I declare that I do not have articles in my possession which I know to be a threat to institution safety, security, or good order. I am aware that if I have questions about what is authorized, I should consult with the officer. I am aware that the penalty for making a false statement is a fine of not more than $250,000 or imprisonment of not more than five years or both (pursuant to 18 U.S.C. § 1001). I am aware that the visiting area, including restrooms in the visiting area,

3

may be monitored to ensure the institution security and good order.

The defendant printed and signed his name below this statement.

After making a false statement, the defendant carried the two redweld folders into a legal visitation room within the FDC, where he met with Thrones for 18 minutes. Following this meeting, the defendant left the room with just one folder, and he gave the other folder to Thrones, so that Thrones could deliver it to Jahlil Williams. Surveillance video shows that Thrones did not carry any redweld folder into his meeting with the defendant.

Officer James Tupper was stationed in the shakedown room adjacent to the legal visitation rooms, and he strip searched Thrones on the way into the room, with negative results. Following the visit, Officer Tupper noticed that Thrones was carrying a red folder that he had not possessed 20 minutes earlier. Officer Tupper ran a metal detector over the folder, with a positive result. Prison personnel searched the folder, whereupon they found and photographed a Motorola cell phone wrapped in cellophane, a charging cord, 83 strips of suboxone, and 240 loose cigarettes. Suboxone, cell phones, charging cords, and cigarettes are all prohibited objects that inmates at the FDC cannot possess.

## II.   STATUTORY MAXIMUM AND MINIMUM PENALTIES

Count One

The statutory maximum penalty for 18 U.S.C. § 371 is 5 years' imprisonment, three years of supervised release, a fine of $250,000, and a $100 special assessment.

Count Two

The maximum penalty for 18 U.S.C. § 1791(a)(1) is 20 years' imprisonment, five years of supervised release, a fine of $250,000, and a $100 special assessment if a defendant provides suboxone to an inmate. *See* 18 U.S.C. § 1791(b)(1), (d)(1)(C); *United States v. Redden*, 844 F. App'x 909, 910 (7th Cir. 2021) (noting that suboxone is a "narcotic drug" under 21 U.S.C. § 802(17)).

Count Three

The statutory maximum penalty for 18 U.S.C. § 1001(a)(2) is 5 years' imprisonment, three years of supervised release, a fine of $250,000, and a $100 special assessment.

Total Maximum Sentence

Given the foregoing, the defendant's maximum sentence is 30 years' imprisonment, three years of supervised release, a fine of $750,000, and a $300 special assessment.

**III.     SENTENCING GUIDELINES CALCULATION**

The United States Probation Office correctly calculated the defendant's advisory sentencing guidelines range as 8 to 14 months, based on a final offense level of 11 and a criminal history score of I.

The defendant objects to the Probation Office's recommendation to impose a two-level upward adjustment to his offense level under Section 3B1.3 of the guidelines. Under Section 3B1.3, an enhancement applies if a "defendant abused a position of public…trust…in a manner that significantly facilitated the commission…of the offense."

To determine if the defendant occupies a position of public trust, courts consider: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority to which the position vests in defendant visa-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position." *United States v. Sherman*, 160 F.3d 967, 969 (3d Cir. 1998). Here, video evidence shows the defendant used his position as a lawyer to bring an opaque folder containing contraband into the FDC. A non-attorney could not have brought such an item into the prison. The defendant's position thus allowed him "to commit a difficult-to-detect wrong" and vested him with authority that enabled him to commit a crime. *Id.* Moreover, FDC personnel "reli[ed] on the integrity" of the defendant when they permitted him to carry the folder into the prison, and when they did not physically examine the contents of the folder prior to the defendant's meeting with Thrones. *See id.* All three factors thus support a finding that the defendant occupied a position of public trust.

Moreover, the defendant's position of trust significantly helped him commit the crime. The defendant trafficked the contraband inside his legal folder, a folder he could only bring into the FDC because he was an attorney. "[W]here a defendant obtains his minimally-supervised position by virtue of his professional training and license and then takes advantage of the discretion granted to him in a way which significantly facilitates the [crime], we can rightly say that he has abused a position of trust." *Id.* at 971. Here, the defendant carried a folder into the FDC by virtue of his professional license, and he took advantage of the discretion given to him when he carried the folder and its contraband into a prison. The Court should apply the two-level enhancement.

## IV.     CONSIDERATION OF THE 3553(a) FACTORS

The Supreme Court has declared, "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" of a sentencing decision. *Gall v. United States*, 552 U.S. 38, 49 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

The Court must consider all of the sentencing factors set forth in 18 U.S.C. § 3553(a) in determining the appropriate sentence in this case. The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[1]

---

[1] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that

7

### A.   The nature and circumstances of the offenses and the history and characteristics of the defendant.

The defendant's abuse of the public trust merits a sentence of imprisonment at the top of the guidelines range. The defendant did not merely traffic narcotics into a prison – he did so by abusing his status as an attorney. Instead of working to uphold the good reputation of the legal community, the defendant's actions have lowered the public's estimation of his profession.

Moreover, the defendant committed his crimes despite having many advantages not enjoyed by most criminal defendants. The defendant had an "idyllic childhood" where he was loved and cared for by both his parents. PSR at ¶¶ 50-51. He admits that he "grew up with a silver spoon" and "wanted for nothing." *Id.* at ¶ 51. Moreover, he reports being in good physical health, *id.* at ¶ 63, and he has no issues with substance abuse, *id.* at ¶ 69. Given the advantages that the defendant possessed and his abuse of the public trust, the Court should sentence the defendant at the top of the guidelines range.

### B.   The need for the sentence imposed to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offenses.

The Court should also sentence the defendant at or near the top of the guidelines to reflect the seriousness of his offenses and to justly punish him. To the extent that the defendant is alleging he was threatened into smuggling the contraband, the Court should remember that the defendant is an experienced criminal defense attorney. If any such threats were made, he knew

---

the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"   *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (quoting *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

8

exactly how to report them to law enforcement. Moreover, co-defendant Jada Williams paid the defendant $2,000 just three days before he smuggled the contraband into the FDC. *See* PSR at ¶ 17. Such evidence indicates that the defendant was motivated by greed, rather than by threats against him.

> **C.   The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

This case presents a clear need for general deterrence. Special Agent Kurt Frimel will testify at sentencing about how narcotics and other contraband are constantly smuggled into the FDC. By sentencing the defendant to a term of imprisonment at the top of the guidelines range, the Court can discourage other individuals from trafficking contraband to prison inmates.

> **D.   The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

The defendant has no educational or medical needs that justify reducing his sentence. He is 57 years old, reports being in good physical health, and has no issues with substance abuse. Simply put, the defendant's health cannot support giving him a sentence at the bottom of the guidelines range.

> **E.   The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Finally, a sentence at the top of the guidelines range will avoid creating an unwarranted disparity between the defendant and similarly situated criminals. Although under "18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 89-

91 (2007), it remains the case that "the [Sentencing] Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise," *id*. at 109 (internal quotation omitted). The Supreme Court has thus recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109 (quoting *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007)). Moreover, "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

Here, a sentence at the top of the guidelines range would avoid creating a disparity between the defendant and similarly situated criminals. Indeed, the defendant enjoys advantages that many individuals charged in federal court cannot even imagine. At the time of his crimes, the defendant possessed a law license. Moreover, he grew up in a loving and supportive environment. To give the defendant a below-guidelines sentence, given the privileges he has enjoyed, would be quite unfair. Instead, the Court should sentence him to a term of imprisonment at the top of the guidelines range.

V. **CONCLUSION**

The Court should impose a sentence of imprisonment at the top of the guidelines range to fairly punish the defendant for his crimes.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s/ Michael Miller*
MICHAEL MILLER
Assistant United States Attorney

11

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Government's Sentencing Memorandum has been served by electronic filing upon counsel of record and by electronic mail upon Senior Probation Officer Carolyn DeMayo.

                                                                  */s/ Michael R. Miller*
                                                                   MICHAEL R. MILLER
                                                                   Assistant United States Attorney

Date: January 20, 2026